Case up this morning is 4-18-06-6-2, Berkeley v. Springfield Park District in Himes. For the appellant is Nathan Wetzel. You are he, sir? Yes, sir. And for the appellee is Craig Unrath. Mr. Wetzel, you may proceed, sir. May I please report? Counsel. The accident at issue in this case took place just about three years ago, August 24, 2016. John Murphy was in a bike accident. He basically hit a collar that sticks up about three inches out of the ground that's in the middle of the bike path. Over on the bike path, the inner urban trail is what kind of shields here. This collar, it holds generally a baller. There's a series of three ballers that are underneath a railroad trestle that is meant to prevent vehicular traffic from going down the bike path. The construction of this baller and the collar are very significant in this case, so I wanted to go through that. The collar itself, again, is a steel collar that sticks up three inches out of the ground. It at one time was painted yellow. In fact, in this case, it was still painted yellow at the time of this accident. It has two holes in the side of it. There are similar holes in the baller itself where a pin goes through, and you can lock the pin so that basically the pin can't come out. When it's locked, the baller itself cannot move. It cannot twist. It cannot come out. The baller also has two handles on it. When the pin is in place, since it can't rotate, the handles don't stick out into traffic. They're basically the force of the traffic. Mr. Murphy went to the Ivy Grill on his bicycle to meet some friends, and he was on his way back. He didn't really notice anything was amiss. In his deposition, he said that when he was two to three inches away from the collar, that was the first time that he saw it. He didn't have time to avoid it. He did it. He had a pretty significant accident where he suffered a concussion. He could remember what happened immediately after the accident. He had some facial lacerations, and he had some pretty significant injuries. Mr. Wetzel, can I interrupt you and just have you jump ahead and tell me, as succinctly as possible, what is the evidence of the defendant's willful and wanton conduct here? Sure. The willful and wanton conduct is based on an under-indifference standard in this case. And the indifference is that this particular lock is designed that when other people besides the park district have to go onto this track, they have to cut that lock. And it basically is then open to vandalism, or they may even throw the collar to the side at that point in time. The collar is known to everybody to be a danger in the middle of that path. Everybody except Dr. Murphy. Well, when I say everybody, Your Honor, you're correct. I'm talking about the employees of the park district who all testified opinion about it. Let me ask this question to clarify. You're not saying that the bollard is a danger if the bollard is in the collar, is it? The bollard is not a danger. So it's only if the bollard has been removed by somebody. When it has been removed by somebody, the collar itself, which caused the injury in this case, is this part that is dangerous in and of itself. Had the bollard been present in the collar and Dr. Murphy written into it, there would be no claim to be made there, would there? Your Honor, that's not the case. You probably would not have brought this up. Counsel, I know it's not this case, but I'm asking you that question anyway. That is correct, Your Honor. It would not be. Is there any dispute that this bike path is recreational property? There is not. So under Section 3-106 of the Tort Immunity Act, for you to prevail, you have to demonstrate willful want to conduct the event. That's correct. That's what you were describing, right? That is correct. Okay. Why is there so much discussion about 3-102 and notice as if this could be a negligence? In other words, if this weren't recreational property, if it were, let's say, an entryway or something into a park district building, I could understand all that discussion. But is my understanding correct that once this is deemed to be recreational property, 3-106 applies and essentially nothing else matters? Isn't that true? That is, it's willful wanton or innocent? Your Honor, that is correct. However, notice is a distinct part of the willful wanton test in 106 as the cases that we cited down there. Well, but in other words, to be more explicit, there's a lot of discussion about 3-102 that you folks raised. You raised, they respond to, but I don't understand the pertinence of it. This is a 3-106 analysis, isn't it? Well, Your Honor, the reason we brought it up is because the trial court had two cases and it was the one and two. But the trial court was responding to the grounds and claims you made. That's correct. Why did you even talk about 3-102? Well, because the way that the court had written its opinion, the trial court had been talking about the way that they had written their opinion. They did focus on one of the two first. Defendants move for summary judgment based both on 3-102 and 3-106? That's correct. Trial court occurring at its summary judgment on both bases, you address that in your appeal? That's correct. Okay. If we were to agree with the trial court on 3-106, we wouldn't have to discuss anything further, would we? If you agreed with 106, and the same would be true of 102. If you agreed with 102, you wouldn't have to address 106. They both would provide some modicum of bases for the trial court's opinion. When you talked earlier in response to Justice Harris, you mentioned, and I may not have this correct, you thought it was a willful disregard? Utter indifference. Thank you. An utter indifference. What are the factors in this record which demonstrate the utter indifference? The factors that demonstrate the utter indifference is that we have to understand that the park district, up to 10 times per season, 10 times per year, come across as an incumbent that follows down. We have the newer case in this that we've cited about continual vandalism and how, under certain circumstances, if you know that vandalism is occurring or that this is a common problem that happens over and over and over again, you have to do something about it. A duty arises at some point in time where you have to take care of it, and when you don't do that, it really does show a conscious disregard for the safety of the public, and it shows utter indifference. You might have missed this in your brief, but tell me anyway. If the day before this accident occurred, your general counsel for the park district or its park district boss, whatever the title might be, were concerned about an accident of this kind possibly occurring for the reasons you just suggested, what would you have them do? Well, I think that there has to be a temporary measure. So you need to warn the public that, you know, here's this problem, that there's this collar that sticks up. You know, and there's actually ways that are in the record here, Your Honor, that they showed this by putting a diamond, for instance, around it to warn the public that this is coming up or a sign of some sort. Well, but see, the problem is if the bollard is present, we don't have to warn them of anything. So the question then goes back to what you just were referring to. The bollard's been taken out. The collar becomes a dangerous thing, and someone like Dr. Murphy might run into it, and it's bad. So what are you going to do? What directions are you going to give to address the situation of some third party removing the bollard? How are you going to prevent that? Or what actions are you going to require the Park District to take in the event it's happened? Ideally? Well, you're the boss. And I understand. Ideally, you would sink that collar three inches down so it wasn't obstructing the right path. And then when the bollard was removed, there would be nothing to hit. Was that alleged in terms of defective design or construction? We did, Your Honor. Okay. And how was that managed at the trial court level? It wasn't addressed at the trial court level. Did you present any evidence about this? For instance, defective design seems to me to require expert evidence. Doesn't it? It would, Your Honor. We have a doubt about that. Well, then what else have you got? You're the boss of the Park District. What can you do to, you know, this, what was your term again? Utter indifference. Utter indifference. To demonstrate you're not only, there's not utter indifference, but you're not indifference at all. You really are concerned about addressing it. There are Department of Transportation suggestions that we have provided in the record here that said that in a situation like this where you have something that sticks up out of the ground, you should warn them by putting a diamond around it on the ground or a sign when you're approaching it. Counsel, I keep going back to the very first question I asked you. Sure. If the bollard is present, there's no need for a warning. So it's only, there's only a warning required if the bollard is gone and there's a collar out. But in this very case, we don't know how long the bollard was out, but apparently it sounds like a matter of minutes since, as Dr. Murphy wrote past this intersection, for lack of a better way to put it, with the trestle, apparently the bollard was present then. Isn't that a reasonable inference? Your Honor, we don't know that. Well. Because Mr. Murphy said that he didn't remember if the bollard was there or not, and there is no testimony as to whether the bollard was there or not the first time he wrote that statement. Well, if it were there, whenever the bollard is present, in other words, a warning like the triangle in yellow is only required if the bollard's gone. So since you've got lots of bollards and you don't know about third parties taking them out, what are you going to have the Park District do? I suppose one way to do it is to make the bollards such that they can't be removed but doesn't that defeat the purpose? It does defeat the purpose, and we would not be arguing that. There are actually two bollards here where they cannot be removed on either side. It's the one in the middle of the path that has to be removed so that people can have access to it. So then what are you going to do about that bollard to address third parties removing it without permission of Park District? Well, Your Honor, again, make it so that when it is removed up to ten times per year, it isn't a danger to the public either by warning or by sinking it down. How do you do that? You can sink it down three inches and then it's not obstructing the path anymore. Was there any expert testimony or evidence supporting the defective design, defective construction plans? Your Honor, there isn't in this case, and the reason for there isn't is because we did not get to that when the summary judgment was granted before all of the discovery happened. Was there a request made to postpone the resolution of the summary judgment motions in order to take discovery on those issues? No, it wasn't, Your Honor. But the reason that we did not is because the bases that they had their summary judgment on didn't really involve defective design. It involved 102 and 106 with regard to notice. And we believe that there was notice in this case. The defective design didn't really come to light in this discussion. May I ask, under 106, if there's no evidence that the Park District itself removed the bollard, and there isn't, right? No, that is a disputed issue. Well, it's disputed because he says, yeah, the grass was cut, he heard some machinery. He can't say it was lawn mowers, didn't see any lawn mowers. But he'd like us to surmise that possibly they were cutting grass. But other than that, there really isn't any other evidence that they removed it themselves, is there? Besides his testimony and the testimony of the employees that they were the ones who cut the grass, there's nothing more than that. But didn't they also say nobody was there that day? Nobody did any work around that bollard that day. And again, Your Honor, that's a disputed issue of that. Okay. Would you agree... I'm sorry, I didn't realize you were... Would you agree, then, that you'd have to be able to establish that the Park District either knew about the removal and knew that it created a dangerous condition? Because all of these questions have kind of presupposed your premise that this creates a dangerous condition. Doesn't the Park District have to know, number one, that it creates a dangerous condition, or know that there are previous accidents or injuries because the bollard's been removed, and then do nothing to effectuate some sort of safety plan? I need to modify what you just said, because you don't need to know that it was a dangerous condition. That's the case of Tracy, who was in the village for a long period of time. You need to know that of the condition. In that case, it was tracks in the stairway going up to City Hall. And the court found in that case that you didn't need to know that that was dangerous, you just needed to know about that condition. Is that a rule which makes good sense? I believe it is, Your Honor. We're not required to follow it, Judge. I understand that. You have the power and the absolute right to do that. However, it does make sense that if you knew of a condition of a deterioration of stairs, like in the Tracy case, and you knew that it had been that way for a very long period of time, that even if you didn't realize, oh, I don't know exactly how an accident's going to happen, but an accident could happen, you don't need to know the dangerous condition, you just need to know that that is a condition that's out of the ordinary, that probably needs to be corrected. And it would be the same here, because you know that you have a 3-inch collar sticking up out of the middle of the ground in the middle of the bike path. You don't know if someone's going to step on it, you don't know if someone's going to hit it, but there are many, many ways that that could be very dangerous to the public, sitting in the middle of the bike path. How is this different from municipal liability cases involving a missing manhole cover or a missing stop sign? Municipalities are faced with those prospects any number of times. Either, you know, take the sign instance, someone either, you know, by way of accident, someone has hit the sign and knocked the stop sign down, or vandals have come and defaced the sign or stolen the sign, or a manhole during the period when there was a rash of metal thefts, manholes were getting plucked out of the streets right and left. The municipality doesn't know about it. How can they be responsible for the resultant injuries of someone falling into the manhole, a bicyclist hitting the manhole, a stop sign, you know, or an intersection collision because of lack of stop sign? You know, in those situations, the municipality, unless they are provided with notice of the defective condition, they have no ability to remedy the situation. How is that different from what we have here? In those cases, Your Honor, and there is a line of cases, and we addressed those in Part 3 of our notice, Part 3, it really depends on how long they've been down and whether there should be constructive notice of that because of the length of time that condition has been present. And there are two manhole covers, not manhole, but they're actually lids on water pit cases that we cited in your Harding and Grinnell case, and they found liability in both of those cases, and provoked unwanted conduct in both of those cases because they failed to secure lids that were on top of these water pits and people stepped on them and fell and injured themselves, as both Grinnell and the Harding case. With regard to a stop sign that is missing, again, if the stop sign is missing for a day and there's no notice of it, well, in that case, there probably is immunity. But that's not what we have in this case, and the distinction between that case and this case is that this ballroom, for a third party to get down this path, they have to remove the lock. They don't have a key. That's the way it's designed. It has to be snapped. And the ballroom can either be thrown aside or anybody can come and take it out at that point in time. This happens up to 10 times per year. Stop signs generally aren't hit 10 times per year, but how can you put that up? If they were, then maybe you should figure out a way to...  ...make the stop sign more secure. If it happens 10 times a year, what are you going to do as the boss of the park district to warn people in the event it happens? The only thing you've cited to us so far is we're going to make the collar equal to the ground, which, as Justice Sarah suggests, implies that there's a structural defect or design defect in it not being that way. Other than that, you haven't suggested a thing. The diamond around the parking desk wall. By definition, you only know about that when you know the park district knows it's down. Now, what I'm talking about is what can you do to address the situation to make sure you have notice somehow that, oh, we've got to put up a diamond or put the bollard back. Well, again, the guidance provided by the Department of Transportation talks about the diamond. Can I take it back one step further? Sure. How long has this trail been in place? 14 years? 14 years. In that entire time, in the 10 times per year that this has happened, there has never been an accident. So you're saying this is creating this inherently dangerous condition when apparently 10 times a year for 14 years this has occurred without there ever being an issue. Why does that then require the park district to do anything? The issues that we have cited, and it's really just one that really fits the bill, is that the pin was removed at one point and that did cause an accident. Not because they hit the collar. No, it didn't. The guy said the handles were in the path of travel now and that people could hit them. But he didn't claim in his email that he got hurt, did he? It's silenced to that point, Your Honor. He just told them that they were perpendicular now. The handles were perpendicular instead of parallel. That's correct, and that was a dangerous cause. And the only person that's ever hit it was a lady that hit it 11 years before, I think, wasn't it? Who hit the actual baller. And I think it's the flex, Your Honor. I think that that was in 2013 and it's 2005. Counselor, your time is up. You'll have another opportunity to address this in rebuttal. Thank you, Your Honor. Mr. Unrath. Good morning. My name is Craig Unrath. I represent Springfield Park District. Morning. Craig and I have been riding this trail for 11 years and never once during that time saw a baller that had been missing. I've never heard of anyone being injured by a missing baller. It's important that those of the Park District have never heard of anyone. Could you raise up the microphone? Make sure it's capturing every utterance, Mr. Unrath. Thank you. Go ahead. The important thing here is that the Park District had no knowledge of any injury of its kind ever occurring. There's a reason for that. It's that the Park District has, during the season, a five-man crew inspecting this trail several times a week. They had every reason to think that their inspection program was successful. Why? Because there had never been any accidents of this type. Every single man on those crews is instructed and trained to replace a missing baller immediately. What's the most favorable evidence, or what's the evidence viewed in the light most favorable to a plaintiff as to how long the baller had been down and notice to defendants that it was down? There's a complete absence of evidence on both points. We have no idea. This baller may have been down for three or four minutes, may have been 45 minutes, may have been a couple of hours. But the important thing is that the Park District was never notified of this baller being down. If they had been, if it had been, they would have fixed it. They would have sent a crew out immediately. That's what these crews do. They have a system in place to resolve this particular problem, and that, as far as anyone can tell, that system had been working for 11 years, or I believe that it's been for 14 years, and never had an accident of any kind. What's the best, oh, sorry. Dr. Murphy rode by the baller at issue going, I think it was south, or was it north? Initially north, yeah. North, and then he rode back 45 minutes later going south. Is Mr. Russell correct that he didn't recall any, whether the baller was up or not? That's correct. He had no recollection one way or the other. But he'd been riding this trail for a long time? Yes, for 11 years he'd been riding this trail. For all we know, it was up at that time. We just don't know one way or the other. There's a complete absence of evidence. In terms of evidence of what notice the park district had, again, there is absolutely no evidence suggesting that the park district was ever aware that this particular baller had been taken down. So no evidence of actual knowledge. What about evidence, and I'm asking you to give me plaintiff's case here, but since it's a summary judgment, viewing the light most favorably to the plaintiff, what evidence is there of constructive knowledge on the part of defendants? Constructive knowledge arises in the case law, again, using the stop sign analogy. When a stop sign is down for a matter of hours, there is no constructive knowledge. When it's down for a couple of days, now the city is responsible, has constructive knowledge. We've set a case law on that point involving a cyclone fence that had been down, I believe, for six days. And at that point, we do have evidence of constructive knowledge. I think at that point you have a question of facts. But here, we have no evidence at all. It may have been just a few minutes. The second district case that Mr. Wetzel cited about the ongoing bad condition of the stairs, what's your position about that? My position is that the case was wrongly decided, but not so much as to create a rift in the law because it appears to be limited to its own facts. In that particular case, the public entity stipulated to the condition of the staircase. They knew it existed, but didn't do anything about it. Now, there was a supposedly mild conflict with established law, saying that you must have notice of the specific defect that caused the injury as opposed to the general condition. But again, I think the distinguishing factor is that the public entity actually stipulated to the condition. They knew it was there, and they did nothing about it. Here, in this case, we have a substantial amount of evidence showing that the Park District carefully monitors its trail. And to suggest that they are responsible, and could we hope liable, for any dangerous condition from which it arises, well, I'm afraid that we're just going to have to forget about having bike trails in this city or in this state. But what about a tree branch falling down the path? Those rangers who are going to remove that tree branch because they know that it's going to cause a potential danger to bicyclists, but without notice that that tree branch has fallen down, how can they be held liable for this? In the end, I believe the court opened its analysis here at this argument with the supposition that this case is really all about willful and wanton conduct. And I don't think that I need to read to you the definition of willful and wanton. I think it's been hashed and rehashed in hundreds of cases. We just don't have that here. You seem to address, by the way, 3-102 a lot. You did. 3-106, if this is disputed, this is a recreational property of a park district. Does 3-102 matter? I don't see that it does, not unless you can prove willful and wanton conduct.  However, the analysis between the two has some related factors, and the single factor is notice. And if the park district had notice, if they knew that this specific property had been taken down, and did nothing about it, I think then you've created a question of fact. And let's look at this case in the light most favorable to the plaintiff. But here we have absolutely no evidence of that, and no reason for that. So we don't know how long that bollard was down. But it was down just a couple of minutes. In either case, there was absolutely insufficient time in which the park district, had they been notified, that they would have been able to get a clue about their offenses. No one reported this problem. There is no evidence that the park district had any knowledge of it. And I think that that's where there's a certain amount of carryover between the two statutes. In the end, we fall into the realm of willful and wanton misconduct, where the public entity has been informed of a dangerous condition, or knew of others that have been injured by it. Here we don't have neither of those. Mr. Wetzel said it was not a dangerous condition, just conditioned. He said the dangerous isn't necessary. I don't know that I recognize the distinction, but throughout our brief, that was referred to as the alleged dangerous condition. Council had mentioned, well, perhaps we should use a different type of bollard. One where, once it's removed, it doesn't do anything, standing up, I suppose. I suppose that would leave a hole in the ground. Again, a different problem. There was some questioning addressing whether the design was raised in this. Well, we're not dealing with the product side of this case here. And quite frankly, I don't recall any allegations that the Park District was willful and wanton in its selection of the bollard that had been installed. And in any event, on appeal here, it's not been raised that it was error for the trial court to grant a summary judgment based on any of these other allegations contained in the complaint relating to defective design or construction. That's correct. I don't know that there's been any allegations of negligent construction of the bollard or the collar. But it's not directed at us. In the end, the bottom line is that if the Park District has no notice, if no one tells them that this bollard is down, then there cannot be a finding of willful and wanton conduct. Does the court have any further questions? I don't see any. Thank you, Counsel. Mr. Ruzzo, any rebuttal, sir? Yes. The knowledge of prior injuries or knowledge that the bollard is down is one way to have notice. We've provided other ways that can have notice because we can have constructive notice. And I wanted to point out specifically the Newport case, which we cited extensively in our brief, which is the clips that were on the door to the elevator in the housing project that were continually vandalized. And in that case, the court did find that if you know of continued vandalism time after time after time, even if you don't know in the specific instance that vandalism has occurred, you do have a duty to do something about it. And in that case, 102 and 106 did not apply to the events of that case. Similarly here, we have vandalism over and over and over again. Or we have the Park District. We don't even know if they're doing correctly over and over and over again, 10 times per year, having this bollard be exposed. Was it 10 times in this location or 10 times throughout the trail system? I believe that it's 10 times throughout the trail system. How many removable bollards are there in the trail system? Do we know that? I don't have an exact number for you right now. This is a pretty long trail, 90 miles. It goes all the way to Chatham. I've ridden it myself. I can tell you that, but I don't think it's on the record. From my view, it was probably four or five, but I think the record is probably being put on that one. I don't remember. Was Buford or Wilflin on the case? Yes, it was on the case. And it's a First District case. It's from 1985. Wasn't that where they tried to fix the elevator and they didn't do it properly? That was the case where there were clips on the doors to the elevator, and the girl basically stumbled back, fell down the elevator shaft. And they know they had to constantly repair these clips that were on the elevator door to keep it from swinging freely. But the repairman would bend it back, and ultimately when the little girl went through, due to the metal fatigue from the bending back and forth, it broke, right? I'm not sure if that's the exact case. All I can imagine was they were able to replace the clips. So they may have added some metal fatigue in the past, but I think they could also replace them. Okay. But, Your Honor, I'd ask you to go back and look at that case to be 100% sure, because I can't read that to you exactly from what I have right here. Also, I would also point out that we talked about design here as a potential way that they will go along with the designs that they have in their passion. I would also point to the Mark Twain case that shows that it's not only design, it can be maintenance over the years that can also lead to a constructive notice in a case. That's the case where, over the years, when they would redo the road over a railroad track, it would get narrower and narrower and narrower every year that they did maintenance on it. And eventually, there was not enough room for two cars to pass each other, and there was a head-on collision. In that case, they found that the maintenance, because it was actually the government body that was performing the maintenance, they had notice of it, that it was getting narrower and narrower and narrower and narrower. We have a lot of evidence in this case that the maintenance was also provided on this particular collar in the way of replacing the pin, tracing the block, and painting it. And one of our claims is you couldn't see this collar because it wasn't painted adequately, and the design that they had for the pin and the way that they were going to place it and the way they were going to do that was inadequate to protect the public from this community. And so, in that sense, the maintenance also can provide these circumstances in this case. I think that's all I have for you. Thank you. Thank you. We'll take this matter under advisement and be in recess for a few moments.